TRINITYFARM CONSTRUCTION COMPANY *v.* BRANNAM.

4-3904

Opinion delivered May 20, 1935.

*Reid, Evrard & Henderson,* for appellant.
*James G. Coston* and *J. T. Coston,* for appellee.

BAKER, J. A. F. Brannam was an employee of Trinityfarm Construction Company, a corporation. He alleged that he was employed as a truck driver, working from sundown to sunup; that the truck driven by him was furnished by the defendant, and was not equipped with

good and effective brakes or lights. He further alleged that in December, 1933, about 4 o'clock A. M., while making one of his runs from Blytheville to Barfield, Arkansas, on business for the defendant, he came suddenly upon a sharp curve in the road, which he failed to see on account of defective lights on his truck, and that, his brakes being defective, he was unable to slow down or control the truck, and that by reason of the curve the truck was turned over and he was injured. He says that his jaw was broken; the left side of his head and his left ear were mashed, bruised and mangled; that his teeth were jarred loose, and his back was painfully wrenched, twisted and injured; that, by reason of such injuries, his earning capacity was temporarily destroyed and permanently impaired.

He pleaded further that he had been earning $75 per month, and that he had already suffered and would continue to suffer great physical and mental pain. He sued for $3,000. He had knowledge of the condition of the truck and its defects and pleaded that he had called attention of the defendant to the alleged defects on several occasions, and had received repeated promises of repair.

The defendant denied each and every allegation of the complaint; alleged that plaintiff had for some time been employed by it as a truck driver, experienced in that line of work, and was a mature man, familiar with the mechanical condition of the particular truck involved in the action; that the truck had been inspected as to the condition of its lights and brakes immediately before the plaintiff started on his trip on the night of his injury, and found to be in good condition. Defendant pleaded contributory negligence in driving at a high and excessive rate of speed; in refusing to reduce his speed when approaching the curve. It was alleged that, even if it were determined that the defendant was guilty of negligence, the negligence of the plaintiff in these particulars was greater in degree than any alleged negligence of the defendant, and would completely bar a recovery. Defendant further pleaded an assumption of risk as a defense to plaintiff's action.

1034

Upon trial of the case, plaintiff testified that he was twenty-six years old; that he was employed by the company as a night truck driver, generally going on duty at 5 o'clock P. M., and worked through the night. On the night of the injury he was driving pretty fast, because he had to get back in time to change shifts of workmen to carry other men out to work, and to return those who had worked during the night; that he was driving something like thirty or thirty-five miles an hour. It had rained all night, was raining and foggy. At the time of the accident the lights were not good. "One light wasn't no account, and the brakes wasn't no account." He got on the curve before he saw where he was; that he tried to make it and couldn't do it. If he had had good lights, he could have seen far enough ahead to have slowed down for the curve. He had complained prior to that time to the foreman about the brakes and lights practically every time he had an opportunity. They were going to put in a new battery on the truck, but didn't do it. It was a weak battery that made the lights weak. On his trip out he had stopped at a service station to put water in the radiator, and his motor stopped, and he was a couple of hours or more trying to crank the truck to get it started again. After that he did not stop again until the wreck occurred. At the time of the accident he had with him one Rogers, who was riding in the truck, though he was not employed by the company. Plaintiff had worked for the defendant, at the time of the accident, for about a month and a half. This was the same truck he had been driving all that time.

Rogers had sued the company, and he had testified for Rogers within about a month after the accident, at a time when his memory was fairly fresh on all incidents in relation to the accident. At the time he testified in the Rogers case he was asked about his own injuries. He thinks he said something in his testimony in that case about a broken jaw. Prior to the trial of the Rogers case he had given a written statement. This statement was made within a few days after he was hurt. In that statement he said nothing about the broken jaw. He left it out for a purpose, but doesn't know why. He ad-

mitted in the Rogers case that the written statement was correct, but explains he was not trying his case then. He also answered: "I didn't state that I had a broken jaw—I don't think I did—didn't nobody ask me—it wasn't necessary at that time."

Other testimony was given as to the extent of the injuries suffered by the plaintiff, but it is unnecessary to go into any minute detail in regard to these matters. Whatever the jury may have found in regard to the injuries, or the extent thereof, is binding upon us, and we accept the testimony in regard thereto at the full value placed upon it by the jury, but mention of these particular bits of testimony is made solely for the purpose of preventing a misconception of the views hereafter expressed. Whatever the contradictions may be, and there are some, we accord to the appellee, in regard thereto, full credit and highest probative value his testimony will warrant as determined in the trial court.

But this controversy can be decided upon the admitted, or undisputed facts presented, and, for that reason, we do not detail the testimony offered on behalf of the defendant. Evidencing the knowledge plaintiff possessed of conditions, he said: "The brakes on this truck were no good. They possibly would slow the truck when it was empty. It takes good brakes to stop a loaded truck." He asked them to fix the truck when he first went to work. The brakes were no good then. That was something like a month before the accident. The brakes were worn out. The lining was worn out of them, and the adjustment was all taken up so you couldn't tighten them any more. During the month he had been driving he had been to Barfield practically every night, and knew this curve was in the road. He did not know he was getting close to the curve. He knew he was well within a mile or so of it. It was a rainy, foggy night. The windshield of the truck had frost or moisture on it, and he had on a load about four or five thousand pounds. The curve in the road curves to the right just before getting to Smotherman's house, and then another curve back to the left. There was a bridge about a mile before he reached the scene of the wreck. He knew he had crossed the

bridge. Had some conception of the time elapsed after he had crossed the bridge, but was not paying attention to that when he was driving in a hurry and working. He wouldn't pay any attention to how long it had been since he crossed the bridge. He did not discover he was getting on the curve until he was right up to it. He could have gone out to the left and gone in a man's field instead of trying to go around the curve. The road runs along the north side of the railroad. He was driving along the gravel road parallel with the railroad. The road curves, crosses the railroad, and then curves back along the railroad on the south side of the railroad, and across the lake into Armorel. It was right in that double curve crossing the railroad tracks that the truck wrecked. There is a dirt road leading straight on down the side of the railroad from the curve where he turned over. Had he gone right on down that dirt road, instead of trying to make the curve, he possibly would not have turned over. Witness then made an observation that a man can study about what he could have done after a thing is over, but he did not have a lot of time for thinking on that occasion.

He knew the curve was there, and knew it was a sharp curve; knew the brakes were bad and wouldn't stop or slow down the truck, and he could see only well enough to tell he was going straight down the road. There was no traffic meeting him. He didn't see this curve until he got right in it, but could see he was not meeting any cars with lights on them. He couldn't see any distance ahead of him to tell whether he was on a straight road or curve; admits that he possibly testified in the Jim Rogers case that he was going thirty-five or forty miles an hour. He didn't pay any attention to how fast he was going.

In his testimony in the former case he said that the load on his truck was about 5,000 pounds in five pieces; that he was driving at thirty-five or forty miles an hour; and in answer to question "Does it strike you that you were being a little careless of your own safety in doing that?" he answered "Yes, sir, I was a little careless,

well, I didn't see any cars coming meeting me, and I just wanted to get out there and get back.''

In the trial of the Rogers case he testified, ''I took my foot off the accelerator, cut my steering wheel to my right, but the truck was going so fast I just went straight ahead, ran down the railroad tracks, and when the wheels hit the tracks the truck began turning over on the left side.''

Rogers, who was with the plaintiff, the appellee, and the only witness to the accident, testified for the appellee as follows: He had started out to Barfield with Brannam. At the time of the accident, the truck was going about thirty-five or forty miles per hour. The road they were traveling was a pretty fair gravel road, but there was a sudden curve across the railroad at scene of wreck. It was raining and foggy that night, and the truck lights were bad, couldn't see very far.

Argument is not necessary to determine the cause of the accident. Bad lights did not cause the truck to turn over. Driven at the same rate of speed, and under the same conditions in day time, the same results would have been experienced. The momentum of the truck, loaded as it was, made the process of braking much more difficult. Nobody knew that better than the driver of the truck.

It can make little difference whether he drove thirty or thirty-five miles an hour, or, as he testified in the Rogers case, thirty-five or forty miles an hour. He was, at least, driving so fast he could not hold the truck upon the highway in making the curve. He admits that he was a ''bit careless.'' He was powerless to keep the truck upon the road. He did not have it under control.

Since ordinary care must be measured according to the circumstances and conditions prevailing at the time of the danger, menace, or threat of injuries, and since he was thoroughly familiar with the fact that the lights were bad, corresponding precautions should have been taken by him to prevent injury to himself, the truck, or to persons, or property upon the highway. He knew the weakness of his battery, the poor quality of his lights, as he knew also that the braking devices, for slowing down, or

controlling the car, were very poor. True, he had lost time, and may have been late if he had driven at a somewhat slower rate, but he would have been safe and would not have involved his employer in a suit with Rogers, and later in another suit in which he was the plaintiff.

The combined effect of the poor brakes, and the bad lights yields no argument upon the question of liability of the employer, but the two defects complained of by him, and upon which he attempted to base liability, imposed upon him an obligation of greater care and caution in driving than would have been present if the truck had had good brakes and good lights. The accident would not have happened, except for the excessive rate of speed, under the conditions and circumstances. It was the efficient cause, and without which the accident would not have occurred. He is the author of his own misfortune.

But it is argued that these defects had been reported by him from time to time, and there had been repeated promises to repair. For the purpose of this suit we assume the correctness of this statement. But this can avail the appellee only to such extent as to prevent the imposition of a doctrine of assumed risk by the defendant, as a defense to a suit for injuries caused by the defects. Assumed risk arises out of contract, and is available under proper circumstances and conditions to the employer as a defense. The promise to repair upon complaint made of the defects generally amounts to a waiver on the part of the employer of that defense to a suit for injuries caused by said defects.

Waiver of that right of defense to plead the assumption of a risk is not a license on the part of the employer to the employee to disregard ordinary care for his own safety and protection, nor is it an assurance or guaranty that the employer will become liable for any or all injuries the servant may receive by reason of other or independent causes.

Bad lights and defective brakes were conditions present at the time of the accident. Neither caused the accident. *Wisconsin & Ark. Lbr. Co.* v. *Scott,* 153 Ark. 65, 72, 239 S. W. 391.

Waiver of assumption of risk by the appellant could in no event be extended beyond the matters about which complaints were made, and the repair of which was promised. *Roach* v. *Haynes,* 189 Ark. 399, 404, 72 S. W. (2d) 532.

It does not serve to relieve the servant of the exercise of ordinary care concerning defects, with which he is conversant, and the dangers of which are duly appreciated by him. The rule is correctly announced in *Togo Gin Co.* v. *Hite, ante* p. 454.

In this case Brannam was in sole control and operation of the truck, and was not deprived of the use of his discretion by any expressed or implied assurance of safety.

Since it is and must be held that the excessive rate of speed under the conditions prevailing in this case, as shown by the appellee himself, and not the poor lights, nor the bad brakes, is the cause of the accident, the court erred in not directing a verdict for the appellant.

For that error, the judgment of the circuit court is reversed, and the cause is dismissed.